UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| EUREKA! PET FOOD INC, <br><br> Plaintiff, <br><br> v. <br><br> ROSS-WELLS INC, <br><br> Defendant. | CASE NO. C18-252 MJP <br><br> ORDER ON MOTIONS FOR SUMMARY JUDGMENT |

The above-entitled Court, has received and reviewed:

1. Ross-Wells, Inc.'s Motion for Summary Judgment (Dkt. No. 33), Eureka! Pet Food, Inc.'s Response in Opposition to Ross-Wells Inc.'s Motion for Summary Judgment (Dkt. No. 46), and Reply to Ross-Wells, Inc.'s Motion for Summary Judgment (Dkt. No. 48); and

2. Eureka! Pet Food, Inc.'s Motion for Partial Summary Judgment (Dkt. No. 38), Ross-Wells, Inc.'s Response to Eureka!'s Motion for Summary Judgment (Dkt. No. 42),

| | |
|---|---|
| 1 | and Eureka! Pet Food, Inc.'s Reply in Support of Motion for Partial Summary |
| 2 | Judgment (Dkt. No. 49); and |
| 3 | all attached declarations and exhibits, and relevant portions of the record.  Finding oral argument |
| 4 | is not necessary to arrive at a decision, the Court rules as follows: |
| 5 | IT IS ORDERED that Defendant's motion for summary judgment is PARTIALLY |
| 6 | GRANTED and PARTIALLY DENIED: Plaintiff's claims for breach of contract, unjust |
| 7 | enrichment, violations of the Wisconsin Deceptive Trade Practices Act, and tortious interference |
| 8 | with business relations are DISMISSED with prejudice.  Defendant's motion for summary |
| 9 | judgment on Plaintiff's trademark infringement claims is DENIED. |
| 10 | IT IS ORDERED that Plaintiff's motion for partial summary judgment is DENIED. |
| 11 | **Background** |
| 12 | Defendant Ross-Wells, Inc. ("Ross-Wells") is a Wisconsin meat processing and animal |
| 13 | feed company.  In the late 60's, the owners of the company developed a pet food formula |
| 14 | combining fresh meat and a blend of vitamins and minerals.  Known as "premix," the formula |
| 15 | (which has been altered over time but remained essentially the same for 50 years) is the |
| 16 | foundation of many pet foods offered by Ross-Wells, including dog food. |
| 17 | In 1989, Ross-Wells began shipping a version of premix developed for a local "musher" |
| 18 | (sled team driver) to a man in Alaska named Winston Hobgood, who resold it to Alaska mushers. |
| 19 | Over time, Winston requested that additional ingredients (e.g., liver, corn oil, bone meal) be |
| 20 | added to the premix.  (A declaration from Ross-Wells' plant manager – unchallenged by Plaintiff |
| 21 | – indicates that Winston also adopted some revisions suggested by Ross-Wells; *see* Dkt. No. 37, |
| 22 | Decl. of Kleifgen at ¶ 9).  Around 1993, Winston began repackaging the product under the brand |
| 23 | name "Eureka!."  Winston printed his own Eureka! packaging materials, shipped them to Ross- |
| 24 | |

Wells, and the company packaged Winston's version of their premix formula in the Eureka! materials. At that point, Ross-Wells began rebating their savings (the result of not having to use their own packaging materials) to Winston, calling it a "commission." The rate varied and – like the rest of their business relationship with Winston – the arrangement was never reduced to writing.

The division of labor saw Ross-Wells responsible for manufacturing the special-order premix and packaging it (using Winston's "Eureka!" materials) while Winston coordinated transport from Ross-Wells' Medford, WI plant to Alaska, consulted on dog-related issues and generated a small number of sales leads in the lower 48 states. In 2009, Winston trademarked the Eureka! name and the next year formed a Eureka! business entity. He was the only member of the organization, never had any employees, and never had his own manufacturing facilities.

Although Winston died in 2014, it was not until months later that Ross-Wells was made aware of his passing. Ownership of Eureka! Pet Food eventually passed (after protracted litigation) to Winston's children, Rhonda and Joel. In December 2014 (before the ownership issue had been settled), Rhonda and Joel visited the Medford plant with the intention of continuing to build on the relationship their father had created with Ross-Wells. The relationship did not get off to a good start (Ross-Wells took exception, for instance, to Rhonda's assertion that her father had "invented" the dog food formula being sold as Eureka! pet food), and things were really never the same after Winston's death. Rhonda and Joel did not bring the level of experience or expertise to the business which their father had possessed – they had no experience in dog-related issues, animal nutrition or pet-food manufacturing, did not continue their father's practice of supplying Eureka! packaging to Ross-Wells, and did nothing over the course of their

relationship with Ross-Wells other than maintain the Ross-Wells website and monitor customer-response emails.

For six months following Winston's death, Ross-Wells sent Rhonda a commission check utilizing the rate at the time of Winston's passing (6%, less the cost of packaging materials Ross-Wells has purchased to replenish the Eureka! inventory), despite the fact that the children were not providing the same of level of services their father had (i.e., providing neither Eureka! packaging to Ross-Wells nor consulting on issues concerning dog feeding/nutrition). In February 2015, however, Ross-Wells co-owner Robert Wells advised Eureka! that the commission would need to be renegotiated for those reasons. Between July 2015 and July 2017, Ross-Wells sent Rhonda five biannual commission checks (totaling $22,237.82) accompanied by a reconciliation statement which reflected the total amount of Eureka! product manufactured, multiplied by the new commission rate (1.5%). Rhonda cashed all five checks.

In July 2017, Ross-Wells received a cease-and-desist letter from Eureka!'s attorney, terminating the business relationship and giving Ross-Wells 21 days to (1) cease using Eureka!'s name on their packaging and (2) turn over Ross-Wells' formulas and customer lists as "trade secrets." Ross-Wells responded by letter through their counsel, disputing the "trade secrets" claim. Additionally, Ross-Wells advised Eureka! that the company still had $7600 worth of Eureka! packaging in stock and indicating that (a) Eureka! could purchase it from them or (b) Ross-Wells would utilize the Eureka! materials until they were depleted and then begin packaging under a new trade name. Eureka! never responded to the letter. For two months, Ross-Wells used the packaging "as is" (i.e., without obscuring the "Eureka!" name); thereafter, the company began pasting labels over the Eureka! name on the boxes with their new product names ("Titan Red" and "Titan Blue") and turning the bags with the Eureka! logo inside out.

Ross-Wells also emailed its customers and advised them of the new "Titan" product name and why the name change was necessary. As of November 2017, the company was no longer utilizing the Eureka! materials.

In that same month, Eureka! filed suit against Ross-Wells. The initial lawsuit alleged liability for trade secrets violations, but that claim was abandoned in the Second Amended Complaint. In January 2018, Eureka! mass-emailed 1400 addresses culled from the website it had maintained for Ross-Wells, announcing new production facilities and a new product. Although Eureka! began accepting orders immediately, the company did not actually begin delivering product until May 2018.

**Discussion**

Standard of review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1985). There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the non moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt."); Fed. R. Civ. P. 56(e). Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions

of the truth. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 253 (1986); T.W. Elec. Service Inc. v. Pacific Electrical Contractors Association, 809 F.2d 626, 630 (9th Cir. 1987).

Defendant has moved for summary judgment on all of Plaintiff's claims; the Court will examine them in turn. The final section ("Trademark infringement") includes an analysis of both Defendant's and Plaintiff's motions for summary judgment on this cause of action.

Breach of contract/unjust enrichment

It is undisputed that this was an unwritten contract.[1] Plaintiff bases its breach of contract claim on the following allegations:

> 65. Under the terms of this contract, Ross-Wells was obligated to pay 6 cents for every pound of dog food sold using the Eureka! formulas and trademarks.
>
> 66. Ross-Wells breached this contract by paying Eureka! only 1.5 cents per pound beginning on or about March 26, 2015.

Dkt. No. 27, Second Amended Complaint ("SAC"), ¶¶ 65-66.

Eureka! admits that Winston never discussed the agreement with his children,[2] and Plaintiff presents no evidence of the terms of the arrangement. Defendant, on the other hand, offers the testimony of the plant manager at the Medford, Wisconsin manufacturing site (Winston's primary contact) that the "commission" varied from 4-6 cents per pound over the life of the agreement (Decl. of Kleifgen at ¶ 11), and testimony from the co-owner and longtime Secretary-Treasurer of Ross-Wells that the company

---

[1] Dkt. No. 34, Decl. of Breaux, Ex. A, Depo of R. Hobgood, 60:19-61:1; Ex. B, Depo of J. Hobgood, 57:10-13.

[2] Id., Depo of R. Hobgood, 107:20-108:6; Depo of J. Hobgood, 57:14-17.

    had paid Winston a variable commission of as much as 6 cents per pound
    as consideration for packaging he procured and provided; use of the
    Eureka trade name; his consulting on dog-related questions regarding the
    complete diet Ross-Wells sold using the trade name Eureka; maintenance
    of a website; and forwarding customer leads.

Dkt. No. 35, Decl. of R. Wells at ¶ 8. Robert Wells' declaration also provides a chart showing that, between 1995 and 2014, the commission paid to Winston fluctuated between 3.65% and 6%. Id. at ¶ 9. None of this evidence is disputed by Plaintiff, nor is Defendant's representation that the Hobgood children provided none of Winston's expertise – they knew nothing about dog feeding or other dog-related issues (*see* Depo of R. Hobgood at 10:2-11:6 and Depo of J. Hobgood at 12:11-13:13), and (once the last of the materials provided by Winston ran out) Ross-Wells had to buy the Eureka! packaging itself. Dkt. No. 26, Decl. of J. Wells at ¶¶ 12-13.

  The evidence is clear that the commission paid to Winston (1) was variable and (2) was based on a variety of services he provided to Ross-Wells, services which (with the exception of maintaining the website and forwarding along email inquiries), his children did not provide after his death. Plaintiff has no evidence that the terms of the contract were otherwise.

  Ultimately fatal to Plaintiff's breach of contract claim, however, is the fact that Rhonda Hobgood accepted and cashed five checks representing the 1.5% commission rate over a two-year period, knowing that the payments were based on the reduced rate. Decl. of R. Hobgood at 121:24-122:3. The parties are in agreement that Wisconsin law controls the contract question, and under Wisconsin law the cashing of the checks represents acceptance of the offer of the contract term. Hoffman v. Ralston Purina Co., 86 Wis.2d 445, 454 (1979)("the cashing of the check will be considered acceptance of the offer…"). Plaintiff attempts to distinguish Hoffman as an "accord and satisfaction" case, but "[o]rdinary contract principles apply in determining whether an agreement of 'accord and satisfaction' is reached," (Id. at 453, *citing*

Corbin, Contracts § 1273 at 115) and the case clearly stands for the rule that cashing the checks constituted an acceptance of the contract term (or, in the case, the *alteration* of the contract term to reflect the lower commission rate).  Combined with the fact that Robert Wells wrote to Rhonda Hobgood advising her that the commission percentage was going to be reduced and she did not object at that point, Defendant is entitled to summary judgment on the breach of contract claim.

Ross-Wells makes a secondary argument that, as the contract was based on the personal services of Winston Hobgood, under Wisconsin law his death terminated the agreement.  In light of the fact that the arrangement between Eureka! and Ross-Wells clearly continued on in a modified form for some time after Winston's death, the "death = termination" theory is not persuasive; at the very least, the actions of the parties following Winston's death created a new unwritten or quasi-contract.  The Court also rules that, in finding a contractual arrangement between the parties that was successfully altered by Defendant and accepted by Plaintiff, the quasi-contractual "unjust enrichment" claim (which was plead in the alternative; "[i]n the event no valid contract is found to exist," SAC at ¶ 84) falls as well.

<u>Wisconsin Deceptive Trade Practices Act</u> ("WDTPA"; Wis. Stat. § 100.18)

Plaintiff alleges that "false and misleading statements" made by Ross-Wells in advertisements and announcements, and in communication with its customers, claiming or implying that Defendant's products were "Eureka! brand products," constitute WDTPA violations.  *See* SAC at ¶¶ 70-73; Decl. of Breaux, Ex. G (Interrog. Resp. No. 8).  Defendant is entitled to summary judgment on this cause of action because Wisconsin courts have ruled that the WDTPA cannot be used to sue competitors for representations made to third parties.  <u>Grice</u>

Eng. Inc. v. JG Innovations, 691 F.Supp.2d 915, 923 (W.D. Wis. 2010)("The statute is not designed to protect product manufacturers from the deceptive acts of their competitors.")

In Grice, a federal court ruling on a similar issue -- which (at that point) had yet to be decided by the Wisconsin Supreme Court -- was required to predict what the state's highest court would do in this circumstance. The federal court based its ruling on Wisconsin precedent which established that the "reliance" element of a WDTPA claim could only be satisfied if the alleged misrepresentation had "materially induce[d] the plaintiffs' decision to act." Novell v. Migliaccio, 2008 WI 44 ¶ 51. The Grice court further found that the purpose of the WDTPA was "'to protect the residents of Wisconsin from any untrue, deceptive or misleading representations made to promote the sale of a product' to consumers." 691 F.Supp.2d at 923. A later case from the same district again ruled that the Wisconsin Supreme Court would hold that a business "cannot state a claim for misrepresentation made by a competitor to a third party." Willert v. Andre, 2017 U.S. Dist. LEXIS 170779 at 4 (W.D. Wisc. 2017).

Plaintiff's SAC alleges representations to "the public" and "to Eureka!'s customers" (SAC at ¶¶ 72-73), but nowhere does the company allege (or offer proof) that Plaintiff itself was deceived. Plaintiff attempts rebuttal with a citation to a Wisconsin Court of Appeals case which it claims permitted a WDTPA claim between competitors to go to a jury (*see* Tim Torres Enterp's, Inc. v. Linscott, 142 Wis.2d 56 (Ct.App. 1987)), but – as the Grice court points out – the issue of whether the WDTPA permits a claim by one competitor against another was never raised in Torres. 691 F.Supp.2d at 923.[3]

---

[3] Plaintiff also argues in its response brief that the fact the alleged misrepresentations were made by a "former manufacturer of plaintiff's product turned seller of that product, and plaintiff relied on those misrepresentations to its detriment" permits its WDTPA claim against a competitor to go forward (Dkt. No. 46, Response at 12), but it (1) offers no legal authority for that distinction and (2) offers zero evidence that it "relied to its detriment" on the alleged misrepresentations. It is legal puffery at best. Similarly, Plaintiff claims (without explanation) that "if the

As with the breach of contract claim, Ross-Wells argues secondarily that Eureka! cannot establish the elements of a claim for deceptive trade practices under Wisconsin law. Plaintiff would have to prove that "(1) the defendant made a representation to the public with the intent to induce an obligation; (2) the representation was untrue, deceptive or misleading; and (3) the representation materially caused a pecuniary loss to the plaintiff." Willert, 2017 U.S. Dist. LEXIS 179770 at *13.

The Court finds the issue of whether any statements made by Defendant were "untrue, deceptive or misleading" would be a question for a jury; i.e., is not capable of being established on summary judgment. However, Plaintiff is required in responding to a summary judgment motion to establish proof on every essential element of its case and what Plaintiff has absolutely not been able to demonstrate is the existence of any pecuniary loss as a result of Defendant's statements. At the time the statements were being published (August 2017; *see* Decl. of R. Wells ¶ 18, Ex. H), Eureka! was neither manufacturing nor selling any products of its own; it was not until 10 months after its relationship with Ross-Wells was terminated that Eureka! began selling any product. Depo of R. Hobgood at 54:11-55:11.

Plaintiff presents *no* evidence of any loss suffered as a result of the alleged misrepresentations. It is reduced instead to arguing

> Regardless of whether Eureka! had product on hand to sell at the time the misrepresentations were made, Ross-Wells' false statements were of a such a nature *to be capable of causing harm long after the utterances were made.*

Response at 16 (emphasis supplied). Plaintiff cites no legal authority for the position that this speculative possibility is legally sufficient evidence of harm (and produces no evidence of any

---

Wisconsin Supreme Court were to consider this issue under the facts and circumstances of this case, like in Torres, the claim would stand." Id. at 13. Again, Plaintiff offers no explanation or analysis of why this would be so.

*actual* harm caused "long after the utterances were made"). Eureka! has not adduced sufficient proof of a critical element of their WDTPA claim, and Defendant is thus entitled to summary judgment under either of its theories.

Tortious interference

Plaintiff's complaint alleges that Ross-Wells solicited business from (unidentified) customers of Eureka! and sought to persuade these anonymous customers to "terminate or avoid their present and prospective purchasing relationships with Eureka!." (SAC at ¶ 80.) Prevailing on this claim requires Plaintiff to prove (1) that it had a contract or prospective contract with a third party and (2) it was damaged in that relationship by Defendant's intentional interference. Breismeister v. Lehner, 2006 WI App 140, ¶ 148 (Wis.Ct.App. 2006).

Nowhere in its complaint and not even in response to Defendant's summary judgment challenge, does Plaintiff produce the names of any specific entities with which it had contracts or potential contracts lost because of alleged interference on Defendant's part. Eureka! alludes generally to "historical customers of Eureka!! brand products" (Dkt. No. 47-1, Depo of R. Hobgood at 175:15-20), but argues that it is "not well-suited to identifying customers *by name*" because "Ross-Wells maintained the buying groups and handled all customer shipments and invoices." (Response at 16; emphasis in original.)

Plaintiff's concession that it cannot identify one customer with whom it had a contract or potential contract with which Ross-Wells wrongfully interfered is fatal to this claim. Its position that Ross-Wells is in a better position to identify those parties would have been well-taken at the beginning of the case, but Plaintiff had ample opportunity to conduct discovery on this critical issue. As Defendant points out, Eureka! has had more than a year to request the information it needs to prove its case and it has apparently done nothing in regard to this

element of its proof.  Summary judgment is the time for a party to stop relying on allegations and demonstrate that it can *prove* what it has alleged.  Plaintiff has no evidence of actual harm proximately caused by Defendant's alleged misconduct and thus no proof to substantiate its claim that its business was the victim of tortious interference.

Defendant's request for summary judgment on the tortious interference claim is GRANTED.

Trademark infringement

While not clear from the SAC, it is clear from the parties' briefing that Plaintiff's infringement claims (federal and "common law") relate solely to Ross-Wells' use of the packaging with the Eureka! label that was in Defendant's inventory when the cease-and-desist letter was delivered.  Both sides filed for summary judgment on this cause of action; Defendant seeks dismissal of claims, while Plaintiff seeks summary judgment and "a permanent injunction enjoining Ross-Wells from infringing on the Eureka!! mark." (Dkt. No. 38, Plaintiff Mtn at 2.)

Plaintiff's request for injunctive relief is not meritorious.  The grant of a permanent injunction would require Plaintiff to establish (1) "irreparable harm" which (2) cannot be adequately compensated by money damages.  It succeeds on neither.

Plaintiff argues initially that *any* proof of infringement suffices to establish irreparable harm, citing an unpublished 2013 U.S. District Court case which cites a 1993 Ninth Circuit opinion that "[i]rreparable harm to reputation and goodwill is presumed as a matter of law where, as here, the plaintiff has demonstrated a likelihood of confusion arising from the infringement."  Coach, Inc. v. Pegasus Theater Shops, 2013 WL 5406220 at *5 (citing Metro Pub'g Ltd v. San Jose Mercury News, 987 F2d 637 640 (9th Cir. 1993)).

Although Metro Publishing does not appear to have been overturned, it no longer appears to represent the state of the law. A more recent Ninth Circuit opinion, Herb Reed Enterp's, LLC v. Fla Enter'mt Mgmt., 736 F.3d 1239 (9th Cir. 2013), has this to say about the presumption of irreparable harm in this context:

> In eBay [Inc. v. MercExchange, L.L.C., 547 U.S. 388 (2006)], the Court held that the traditional four-factor test employed by courts of equity, including the requirement that the plaintiff must establish irreparable injury in seeking a permanent injunction, applies in the patent context. 547 U.S. at 391. Likening injunctions in patent cases to injunctions under the Copyright Act, the Court explained that it "has consistently rejected . . . a rule that an injunction automatically follows a determination that a copyright has been infringed," and emphasized that a departure from the traditional principles of equity "should not be lightly implied." *Id*. at 391-93 (citations omitted). The same principle applies to trademark infringement under the Lanham Act.
>
> * * *
>
> Following eBay and Winter [v. Natural Res. Def. Council, Inc., 555 U.S. 7 (2008)], we held that likely irreparable harm must be demonstrated to obtain a preliminary injunction in a copyright infringement case and that actual irreparable harm must be demonstrated to obtain a permanent injunction in a trademark infringement action. Flexible Lifeline Sys. v. Precision Lift, Inc., 654 F.3d 989, 998 (9th Cir. 2011); Reno Air Racing Ass'n, Inc., v. McCord, 452 F.3d 1126, 1137-38 (9th Cir. 2006).

Id. at 1249. The Court finds that this ruling represents the current state of the law, and Plaintiff has no proof of irreparable injury in the form of lost sales and/or lost customers – not surprising, given that the company had no product on the market for the brief period of time when Ross-Wells used its Eureka! packaging. Furthermore, Eureka! is required to establish that the remedies available to it at law (i.e., money damages) are inadequate to compensate for whatever injuries it can prove. Under the circumstances of this case, this is exactly the type of injury which is reduceable to a dollars and cents amount. Plaintiff should be able to produce, via

discovery, the amount of Eureka!-labeled product that Ross-Wells sold and claim their damages as some percentage of that figure (Ross-Wells even offered, in its responsive letter to the cease-and-desist demand, to give Plaintiff its 1.5% commission on any sales of the last of its "Eureka!-packaged" material; *see* Decl. of R. Wells, Ex. E). Eureka! has simply not made its case that its remedy at law is not adequate.

The Court turns next to the parties' cross-motions for a substantive summary judgment ruling on the federal and common law infringement claims. The trademark infringement statute applies to "[a]ny person who shall, *without the consent of the registrant*," use a registered mark in commerce. 15 U.S.C. § 1114(1)(emphasis supplied). Defendant's request for summary judgment of dismissal turns on whether its use of the Eureka! materials for two months in the latter part of 2017 was done with Plaintiff's consent. Resolution of this issue depends on whether Eureka!'s non-response to Defendant's letter of July 27, 2017 legally operated as consent for Ross-Wells to do what it said it would do if Eureka! failed to buy their packaging back from Ross-Wells.

Ross-Wells relies on the Restatement of Contracts 2d for its argument that Eureka!'s failure to respond amounted to consent to its use of the company's packaging despite the cease and desist demand. Defendant relies on this language from the Restatement:

> Where an offeree fails to reply to an offer, his silence and inaction operate as an acceptance in the following cases only:
> * * *
> (c) Where because of previous dealings or otherwise, it is reasonable that the offeree should notify the offeror if he does not intend to accept.

Restat 2nd of Contracts, § 69 (1981). Defendant presents nothing by way of "previous dealings" evidence that establishes that it was customary in the parties' communications with each other, over the history of the relationship, to assume that silence constituted consent. Ross-Wells relies

primarily on the letter it sent to Plaintiff's attorney following receipt of the cease-and-desist demand to demonstrate that it was reasonable to take Plaintiff's non-response for consent. The Court's review of the wording utilized by Ross-Wells in its letter finds that its intention is unclear. The letter indicates that Defendant still had "around $7,600" worth of Eureka! packaging in inventory, and then states:

> If your client does not want to purchase the packaging, then Ross-Wells
> will continue to use it for sales to their customers and Eureka's customers
> *if Eureka desires* with Ross-Wells continuing to pay a commission on all
> sales until the packaging is used.

Decl. of R. Wells, Ex. E (emphasis supplied).

Defendant cites the forcefully assertive language that "Ross-Wells will continue to use" the packaging to argue that it should have been reasonable for Plaintiff to assume that, if it did not object, its packaging would be used. However, that argument completely ignores the phrase "if Eureka desires" which accompanies the declaration. It is the Court's finding that, in saying that it would use Plaintiff's packaging for sales to Ross-Wells' and Eureka!'s customers "if Eureka desires," Ross-Wells at least created an ambiguity regarding whether Eureka! had to indicate that they so desired before Defendant would be permitted to use Eureka!'s packaging. The impact of the language of the letter on the "consent" issue is a disputed issue of material fact, suitable only for jury determination, and is thus unsuited for resolution by summary judgment (for either side).

## Conclusion

Regarding Plaintiff's claims for breach of contract, unjust enrichment, WDTPA violation, and tortious interference, there are no disputed issues of material fact and Defendant Ross-Wells is entitled to summary judgment as a matter of law. Those claims are dismissed with prejudice.

As to the trademark infringement claim, Plaintiff has not established its entitlement to a permanent injunction against Defendant. In view of the disputed impact of Defendant's communications with Plaintiff following Eureka!'s cease-and-desist demand, neither party is entitled to summary judgment on the trademark infringement claims and both motions will be denied as to those causes of action.

The clerk is ordered to provide copies of this order to all counsel.

Dated April 15, 2019.

Marsha J. Pechman
United States District Judge